UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

**FOR PUBLICATION**

---------------------------------------------------------------x
In re:

Chapter 7

SONI HOLDINGS, LLC,

Case No. 23-73863-spg

Debtor.
---------------------------------------------------------------x
NEW FALLS CORPORATION, and MARK A. FRANKEL, Not Individually but Solely in His Capacity as Chapter 7 Trustee of Soni Holdings, LLC,

Plaintiffs,

Adv. Pro. No. 24-08089-spg

v.

SONI HOLDINGS, LLC, KUNAL SONI, individually and in his separate capacity as an apparent successor to OM P. SONI, deceased, ANJALI SONI, individually and in her separate capacity as an apparent successor to OM P. SONI, deceased, 632 MLK BLVD JR LLC, SONI CAPITAL RESOURCES, LLC, WEANONA HUGIE, RICHARD SPEARS, and SONIA SONI *a/k/a* RONITA SONI, solely in her capacity as an apparent successor to OM P. SONI, deceased,

Defendants.
---------------------------------------------------------------x

# MEMORANDUM DECISION AND ORDER AFTER TRIAL

**Appearances:**

VLOCK & ASSOCIATES, P.C.
*Counsel for Plaintiff New Falls Corporation*
630 Third Avenue, 18th Floor
New York, New York 10017
By: Steven Giordano, Esq.
Stephen Vlock, Esq.

LAW OFFICE OF ERIC J. WARNER, LLC
*Counsel for Defendants*
*Weanona Hugie and Richard Spears*
991 US Highway 22, Suite 200
Bridgewater, New Jersey 08807
By: Eric J. Warner, Esq.

**TABLE OF CONTENTS**


**I. INTRODUCTION .......... 1**

**II. BACKGROUND .......... 2**

A. The Second Amended Complaint .......... 5
1. The Parties .......... 5
2. The Note .......... 6
3. The Judgment .......... 6
4. The Guaranty .......... 6
5. The Newark Property Fraudulent Conveyance Scheme .......... 7
6. The Chase Bank Account Scheme .......... 9
7. The Florida Property Scheme .......... 9
8. The Oyster Bay Property Scheme .......... 9
9. Joint and Several Liability .......... 10
10. First Cause of Action: RICO .......... 10
11. Fifth Cause of Action: Tortious Interference with Collectability of Debt .......... 14
12. Sixth Cause of Action: Lack of Legal Justification .......... 15
B. The Missouri Property .......... 15
C. The Default Liability Order .......... 15

**III. LEGAL EFFECT OF DEFAULT ON DAMAGES .......... 16**

**IV. DISCUSSION .......... 18**

A. Proximate Causation Is Required .......... 19
B. Scope of Joint and Several Liability for Damages Caused by RICO Conduct .......... 19
C. Defendants' Schemes Constituted One Association-in-Fact Enterprise .......... 22
1. Common Objective .......... 22
2. Same Core Actors .......... 25
3. Common Entities, Assets, Documents, and Strategy .......... 27
D. Scope of Joint and Several Liability for Damages Caused by the RICO Enterprise .......... 29
E. Failure to Foreclose on the Missouri Property Does Not Reduce Recovery .......... 32

**V. CALCULATION OF DAMAGES .......... 33**

A. The Compensable RICO Injury .......... 34
B. The Debt and Judgment Baseline .......... 35
C. Scheme-Based Evidence .......... 36
D. Calculation of Compensatory RICO Damages .......... 37
E. Statutory Interest on the Underlying Judgment .......... 39

F. Trebling of Compensatory RICO Damages ........ 40
G. Statutory Attorney's Fees and Costs ........ 41
1. Civil RICO Fees and Costs ........ 41
2. Non-Duplication ........ 42
3. Applicable Offsets ........ 43
H. Punitive Damages ........ 44

**VI. THE REMAINING CAUSES OF ACTION ........ 48**

A. The Remaining Claims Do Not Increase the Compensatory Award ........ 48
B. The Remaining State Law Claims Do Not Increase the Compensatory Award ........ 49

**VII. POST-JUDGMENT INTEREST ........ 49**

**VIII. CONCLUSION ........ 50**

## I. INTRODUCTION

This Decision addresses the calculation and assessment of damages in the above-captioned adversary proceeding[1] following the Court's prior decision that established liability and deemed the well-pleaded factual allegations of the *Second Amended Complaint and Demand for Jury Trial* [ECF No. 40-4][2] (the "Second Amended Complaint" or "SAC"), dated March 25, 2025, to be admitted. Here, the Court determines: (i) the proper calculation of compensatory damages, if any; (ii) whether compensatory damages are recoverable under the Racketeering Influenced and Corrupt Organizations Act ("RICO"); (iii) what amount, if any, is subject to trebling under 18 U.S.C. § 1964(c); (iv) whether Plaintiff[3] is entitled to reasonable attorney's fees and costs; and (v) whether punitive damages are legally available and supported by the record.[4]

Liability was determined in favor of Plaintiff against Defendants[5] when the Court entered a judgment of liability in favor of Plaintiff on the First, Fifth, Sixth, and Seventh Causes of Action. [ECF No. 84]. Defendants' default was entered, and the factual allegations of the Second Amended

---

[1] By this Court's *Order Granting Request to Accept Opposition as Timely and Granting in Part Motion to Substitute and Amend Caption* [ECF No. 147] (the "Caption Order"), entered July 28, 2026, the caption of this adversary proceeding was amended to: (i) remove Om P. Soni as a named defendant; (ii) identify Kunal Soni and Anjali Soni, each individually and in a separate capacity as an apparent successor to Om P. Soni, deceased; and (iii) add Sonia Soni *a/k/a* Ronita Soni, solely in her capacity as an apparent successor to Om P. Soni, deceased. References herein to Om P. Soni describe his historical conduct and use the terminology of the existing liability record. The Caption Order controls the designation and capacity of the named parties.

[2] Unless otherwise specified herein, references to numbered CM/ECF entries shall be with respect to the docket of this adversary proceeding [Adv. Pro. No. 24-08089-spg]. References to numbered CM/ECF entries in the main bankruptcy case will use the form "Bankr. Case ECF No.".

[3] For the purposes of this Decision, "Plaintiff" is defined to include only New Falls Corporation. Mark A. Frankel, not individually but solely in his capacity as chapter 7 trustee of Soni Holdings, LLC, shall be referred to as the "Trustee."

[4] The Court directed the parties at the Damages Trial (defined below) to file post-trial briefs concerning, among other things, the possible need to disqualify Vlock & Associates, P.C. as counsel to the chapter 7 trustee due to an alleged conflict of interest. Those issues will be addressed by the Court in a separate decision to follow.

[5] For the purposes of this Decision, "Defendants" is defined to include, collectively: (i) Soni Holdings, LLC; (ii) Kunal Soni, individually and in his separate capacity as an apparent successor to Om P. Soni, deceased; (iii) Anjali Soni, individually and in her separate capacity as an apparent successor to Om P. Soni, deceased; (iv) 632 MLK Blvd Jr LLC; (v) Soni Capital Resources, LLC; (vi) Weanona Hugie; (vii) Richard Spears; and (viii) Sonia Soni *a/k/a* Ronita Soni, solely in her capacity as an apparent successor to Om P. Soni, deceased.

Complaint were deemed admitted under Rule 7055 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

Subsequently, this Court held a damages trial limited to the relief demanded in the Second Amended Complaint. The damages demanded include: (1) the original judgment in the amount of $265,834.84, plus statutory interest from February 22, 2018; (2) civil RICO treble damages under 18 U.S.C. § 1964(c); (3) punitive damages; and (4) collection costs. Herein, the Court will discuss which damages were proven at trial, whether they are legally recoverable under the claims on which liability was entered, and whether they are duplicative.

## II. BACKGROUND

This adversary proceeding originated as a civil action commenced in the United States District Court for the Eastern District of New York [Case No. 19-cv-00449-HG-LGD] (the "District Court") on January 23, 2019, by Plaintiff, through its counsel, Vlock & Associates, P.C. ("Vlock & Associates"). On October 18, 2023, Soni Holdings, LLC (the "Debtor" or "Soni Holdings"), the above-captioned debtor, filed a voluntary petition under chapter 11 of title 11, United States Code (the "Bankruptcy Code") commencing the related bankruptcy case (the "Bankruptcy Case"). On December 26, 2023, the Debtor's bankruptcy case was converted from one under chapter 11 to a case under chapter 7 of the Bankruptcy Code. Plaintiff petitioned the District Court to refer the pending non-bankruptcy litigation to this Court, and over the objection of the Soni Defendants[6], the District Court entered an Order on October 1, 2024, referring the matter to this Court, which took effect on October 4, 2024.

[6] The term "Soni Defendants" is used throughout this Decision to refer to the collective action of Om P. Soni, Kunal Soni, Anjali Soni, and the defendant entities under their control, including Soni Holdings, 632 MLK Blvd Jr LLC, and Soni Capital Resources, LLC.

On March 7, 2025, this Court, by the Honorable Robert E. Grossman[7], issued a memorandum decision [ECF No. 50] (the "Memorandum Decision") granting partial summary judgment in favor of Plaintiff[8], subject to a later entry of judgment upon proper motion to further amend the Complaint. On May 2, 2025, after Plaintiff filed and served its *Second Amended Complaint and Demand for Jury Trial* [ECF No. 40-4] Fdated March 25, 2025, the Court granted Plaintiff's motion to amend the complaint [ECF No. 51]. On July 3, 2025, Plaintiff moved for a default judgment on the remaining causes of action in the Second Amended Complaint, namely, the First, Fifth, Sixth, and Seventh, and further sought to set the matter down for a trial on damages against all Defendants. On August 9, 2025, this Court, again by Judge Grossman, issued the *Order and Judgment* [ECF No. 84] (the "Default Liability Order"), determining liability in favor of Plaintiff subject to a trial on damages (the "Damages Trial"), which was scheduled to, and did commence on, November 7, 2025.

On October 31, 2025, one week before the Damages Trial, counsel to defendants Weanona Hugie and Richard Spears filed a letter [ECF No. 105] requesting an adjournment. The request was made principally on behalf of non-party Wesley Mead, whom counsel described as a "proposed intervenor," although no motion to intervene had been filed. That same day, Plaintiff opposed the request [ECF No. 106], noting that Mr. Mead was not a party to the adversary proceeding and had no standing to seek an adjournment. On November 3, 2025, the Court held a telephonic conference and declined to adjourn the long-scheduled Damages Trial, observing that Mr. Mead was not a party, that counsel had known of the trial date since August 9, 2025, and that

[7] This adversary proceeding and the Debtor's main bankruptcy proceeding were reassigned to the Honorable Sheryl P. Giugliano by administrative order entered September 5, 2025 [ECF No. 91; Bankr. Case ECF No. 202].

[8] The Memorandum Decision recognized that while Plaintiff (New Falls) may have commenced the litigation that became the Adversary Proceeding, the Trustee effectively "stepp[ed] into the shoes of New Falls under [11 U.S.C.] § 544" as the Plaintiff herein only with respect to the fraudulent conveyance and related claims. *See* Memorandum Decision, p. 2.

no motion to intervene was pending. The Court entered the *Joint Pretrial Order* [ECF No. 110] submitted by the parties and directed that the Damages Trial proceed as scheduled.

On November 6, 2025, the afternoon before trial, Mr. Mead filed an omnibus motion [Bankr. Case ECF No. 213] (the "Omnibus Motion") in the Debtor's main bankruptcy case seeking, among other things, intervention in this adversary proceeding, a continuance of the Damages Trial, disqualification of Plaintiff's counsel, limitations on Plaintiff's RICO damages, and relief from the automatic stay to pursue an appeal of state court sanctions. The Omnibus Motion was not noticed for a hearing or an objection deadline. The Court proceeded with the Damages Trial on November 7 and November 17, 2025, and directed Plaintiff to respond to the Omnibus Motion. Plaintiff filed its objection to the Omnibus Motion on November 21, 2025 [Bankr. Case ECF No. 225], after which the matter was marked submitted. On March 6, 2026, this Court entered an Order [Bankr. Case ECF No. 252; ECF No. 134] denying the Omnibus Motion in its entirety and expressly declining to entertain the Omnibus Motion's requests to disqualify Vlock & Associates and limit Plaintiff's RICO damages.

The Damages Trial proceeded on November 7 and November 17, 2025, with appearances by Plaintiff's counsel and defendants Weanona Hugie and Richard Spears, both individually and through counsel. Steven Giordano of Vlock & Associates was examined by Stephen Vlock of Vlock & Associates and gave testimony. Mr. Giordano was cross-examined by Defendants' counsel. Peter Barta, President of New Falls, was examined by Mr. Giordano and gave testimony at the Damages Trial. Mr. Barta was cross-examined by Defendants' counsel. Marc Yaverbaum, a distressed asset manager at MYC & Associates, Inc., was examined by Mr. Giordano and gave testimony. Mr. Yaverbaum was also cross-examined by Defendants' counsel. Richard Spears gave rebuttal testimony, and Plaintiff's counsel declined to cross-examine Mr. Spears. Weanona Hugie

gave rebuttal testimony, particularly on the Soni "Family Agreement" (the "Family Agreement"), and Plaintiff's counsel declined to cross-examine Ms. Hugie. All of Plaintiff's exhibits were admitted.

The findings that follow are drawn from the facts established by default, the testimony presented at the Damages Trial, the exhibits admitted into evidence, and the Court's assessment of the credibility and weight of that evidence. To the extent the Court relies on facts established by the Second Amended Complaint, it does so because those facts bear on liability and the nature of the schemes. To the extent the Court fixes the amount of damages, it does so based on the evidentiary record and the reasonable inferences supported by that record.

**A. The Second Amended Complaint**

1. The Parties

Plaintiff is an Ohio-based entity whose predecessor-in-interest loaned money to defendants Soni Holdings and Om P. Soni. [SAC, ¶ 11]. Soni Holdings, a New York limited liability company, has one sole member — defendant Anjali Soni, Om P. Soni's wife. Defendant Kunal Soni, son of Om and Anjali, is listed as a manager and/or agent of Soni Holdings and/or 632 MLK Blvd Jr LLC. [SAC, ¶ 8]. Defendant 632 MLK Blvd Jr LLC is a New York limited liability company, wholly owned by its member Kunal Soni. [SAC, ¶ 10]. Defendant Soni Capital Resources, LLC, is a Delaware limited liability company, wholly owned by its member Anjali Soni. [SAC, ¶ 12]. Defendants Weanona Hugie and Richard Spears are individuals who conspired with the Soni Defendants to perpetuate fraudulent schemes in New York. [SAC, ¶¶ 13−15].

2. The Note

On or about May 14, 2007, defendant Soni Holdings executed and delivered to Plaintiff's predecessor-in-interest, AmSouth Bank, a *Note for Business and Commercial Loans* (the "Note") for a business loan in the sum of $301,216.50, to be repaid with interest. [SAC, ¶ 18].

The Note was assigned and transferred to Plaintiff by an allonge dated September 15, 2015, which was permanently affixed to the Note and made part of it. [SAC, ¶ 21]. Plaintiff is the owner and holder of the Note. [SAC, ¶ 22].

Defendant Soni Holdings defaulted on the Note in 2014 by failing to timely make principal and interest payments. [SAC, ¶ 22]. The last payment by defendant Soni Holdings was April 14, 2014, and it has been in default since that time. [SAC, ¶ 23].

3. The Judgment

On February 22, 2018, the United States District Court for the Northern District of Alabama entered judgment in favor of Plaintiff and against defendant Soni Holdings in the amount of $265,834.84 (the "Judgment"). [ECF No. 18-10, Ex. F; SAC, ¶ 33]. Plaintiff later registered the Judgment in the United States District Court for the Eastern District of New York [Misc. Case No. 18-MC-1111]. [ECF No. 18-10, Ex. F; SAC, ¶ 34].

4. The Guaranty

On or about the same date the Note was executed and delivered, defendant Om P. Soni executed and delivered to AmSouth Bank a *Guaranty Agreement* (the "Guaranty") guaranteeing the obligations under the Note. [SAC, ¶ 19].

Defendant Om P. Soni later denied signing the Guaranty. [SAC, ¶¶ 20, 26]. That denial was false and made to defraud Plaintiff and obstruct satisfaction of the Note, notwithstanding that Om P. Soni was Soni Holdings' sole member at the time of the loan and received the benefit of the loan

proceeds. [SAC, ¶¶ 20, 26]. Soni Holdings, Anjali Soni, Kunal Soni, and/or Om P. Soni also received proceeds and benefits from the Note and Guaranty. [SAC, ¶ 27].

The Guaranty is central to the collection-obstruction scheme. Defendants presented Plaintiff with fraudulent written and oral statements on at least ten separate occasions, including Om P. Soni's denial that he signed the Guaranty used to secure the loan to Soni Holdings. [SAC, ¶¶ 25–26].

Because of those false statements concerning the Guaranty, Plaintiff was forced to commence a separate action against Om P. Soni in the United States District Court for the Eastern District of New York, styled *New Falls Corporation v. Om P. Soni* [Case No. 16-CV-06805], and incurred damages including litigation costs across several actions. [SAC, ¶ 28]. Defendants knew and understood that Plaintiff would rely on their false statements to its detriment — those statements were fabricated, made as part of a conspiracy to defraud Plaintiff and cause excessive collection costs, and unlawfully obstructed satisfaction of the debt. [SAC, ¶¶ 29–32].

5. <u>The Newark Property Fraudulent Conveyance Scheme</u>

While indebted to Plaintiff, Soni Holdings owned the premises located at 632-634 MLK Jr. Boulevard, Newark, New Jersey (the "<u>Newark Property</u>") from 2011 through 2016. [SAC, ¶ 39]. Defendant Soni Holdings filed taxes and received significant rental payments as the owner of the Newark Property. [SAC, ¶ 39]. Defendant Kunal Soni intentionally misled Plaintiff in March 2016 regarding the status of the debt, ability to pay the debt, and as to the assets owned by Soni Holdings. [SAC, ¶ 39]. Defendant Kunal Soni falsely testified under oath in December 2018 that Soni Holdings never owned any property other than a property in Missouri and that Soni Holdings could no longer pay the debt owed to Plaintiff, because it did not have any income. [SAC, ¶ 40].

Plaintiff was able to determine by deed recorded April 4, 2016 (the "Newark Deed") that Soni Holdings, Anjali Soni, and Kunal Soni transferred the Newark Property to 632 MLK Blvd Jr LLC. [SAC, ¶ 45]. The Newark Deed effectuated a transfer of the Newark Property at the direction of Om P. Soni, Kunal Soni, and/or Anjali Soni, while Soni Holdings was indebted to Plaintiff, and without adequate consideration. [SAC, ¶¶ 47–48, 50]. Upon discovering this, Plaintiff immediately filed a fraudulent conveyance action against Defendants in January 2019. [SAC, ¶ 51]. Defendants claimed that defendant Soni Holdings did not own the Newark Property, and submitted a fabricated document known as the "Family Agreement," alleging defendant Soni Holdings was merely a conduit or placeholder for the purchase of the Newark Property. [SAC, ¶¶ 51–55]. Defendants also submitted a fabricated sales agreement, dated January 18, 2019, between 632 MLK Blvd Jr LLC and Liel Shishi MLK LLC, which is an entity owned by certain of Defendants. [SAC, ¶ 53].

Defendant Weanona Hugie acted as the notary public on the fraudulent Family Agreement. [SAC, ¶ 58]. The Family Agreement was dated August 26, 2011; however, defendant Hugie's notary stamp stated her commission expired November 21, 2020. [SAC, ¶ 58]. In New Jersey, where defendant Hugie was a licensed notary public, the relevant term is five (5) years —meaning Hugie could not have notarized the documents on the date indicated by the documents, because 2020 is more than five (5) years past 2011. [SAC, ¶ 58]. In February 2019, defendant Hugie submitted a fraudulent affidavit alleging that she notarized the signatures of Defendants on the Family Agreement in 2011, but then "stamped" the document eight (8) years later in 2019. [SAC, ¶ 64].

Defendant Richard Spears, as a manager of defendant Soni Holdings, directed defendant Hugie to falsely notarize the Family Agreement. [SAC, ¶¶ 60–61].

6. The Chase Bank Account Scheme

While indebted to Plaintiff, Defendants opened a bank account (the "Chase Account") with JPMorgan Chase Bank ("Chase Bank") under a fake Taxpayer Identification Number ("TIN") and name — Soni Holdings MLK LLC — to use for defendant Soni Holdings. [SAC, ¶ 68]. The Chase Account was used to collect and conceal hundreds of thousands of dollars in rental and other income paid to Soni Holdings between 2011 and 2018. [SAC, ¶ 69]. Due to the fictitious TIN and entity name, Plaintiff was unable to locate the account in collection of the debt owed. [SAC, ¶ 68].

Defendant Richard Spears, having signing authority as manager of Soni Holdings, signed the *Business Account and Signors Form* for the Chase Account in perpetuation of the fraudulent scheme. [SAC, ¶ 70]. Spears deposited and signed numerous checks in accordance with the Chase Bank Account scheme. [SAC, ¶ 71]. When Defendants learned that Plaintiff likely discovered the Chase Account, they transferred the funds. [SAC, ¶ 73].

7. The Florida Property Scheme

While indebted to Plaintiff, defendants Soni Holdings, Om P. Soni, Anjali Soni, and Kunal Soni transferred all right, title, and interest in real property located at 581 Muirfield Loop in Reunion, Florida (the "Florida Property") from Soni Holdings to Anjali Soni by deed recorded May 31, 2016. [SAC, ¶ 76]. The fraudulent deed was signed in New York. [SAC, ¶ 77]. The transfer of the Florida Property was for no consideration or inadequate consideration, as part of Defendants' actions to make defendant Soni Holdings "judgment proof." [SAC, ¶ 80]. The Florida Property was sold for $220,000 in 2020. [SAC, ¶ 167].

8. The Oyster Bay Property Scheme

While indebted to Plaintiff, defendant Om P. Soni transferred all his right, title, and interest in real property located at 10 Bel Air Court, Oyster Bay, New York 11771 (the "Oyster Bay

Property"), to his wife, Anjali Soni, and non-party Sudershan Sethi, as Trustees of the Om P. Soni Irrevocable Family Trust. [SAC, ¶ 84]. The Oyster Bay Property was transferred for no consideration. [SAC, ¶ 86].

9. Joint and Several Liability

Each Defendant's conscious agreement, knowing participation, and intentional wrongful acts perpetuated the scheme to render Soni Holdings "judgment proof," and thus the debt owed to Plaintiff unenforceable. [SAC, ¶ 89]. Defendants were each aware of their respective role in the overall scheme to defraud Plaintiff and together formed an association-in-fact RICO enterprise. [SAC, ¶¶ 90–91]. Defendants collaborated to commit various frauds to prevent Plaintiff from collecting on the owed debt. [SAC, ¶ 91].

All Defendants engaged in affirmative conduct in furtherance of the conspiracy and are jointly and severally liable for acts prior and subsequent to their joining the conspiracy. [SAC, ¶ 92]. All Defendants are therefore liable for the conduct of defendants Om P. Soni, Anjali Soni, Kunal Soni, and other co-conspirators. [SAC, ¶ 92]. Such liability continues until there is clear and unequivocal renouncement of the conspiracy, which, as of the filing of the Second Amended Complaint, never occurred. [SAC, ¶ 92].

10. First Cause of Action: RICO

Defendants engaged in mail fraud, wire fraud, money laundering, monetary transactions with unlawful proceeds, extortion, interstate racketeering, interstate transport of misappropriated funds, and witness tampering in furtherance of the scheme to defraud Plaintiff and prevent collection of the debt. [SAC, ¶ 95].

*Mail Fraud*

Defendants committed mail fraud in connection with the Florida Property scheme, the Newark Property scheme, and the Chase Bank Account scheme by using the United States Postal Service to mail fraudulent documents between New York, Florida, and New Jersey. [SAC, ¶¶ 97−103].

*Wire Fraud*

Defendants committed wire fraud at various points from 2016 to 2025 through their regular, continuous, and systematic use of telephone, computer, and/or fax machines connected to interstate wires for the purpose of executing the Florida Property scheme, Newark Property scheme, and Chase Bank Account scheme. [SAC, ¶ 106].

*Money Laundering*

Certain Defendants committed money laundering from 2012 through at least 2025 by regularly and systematically unlawfully obtaining proceeds from, or that rightfully belonged to, Soni Holdings and took action to conceal or disguise the true nature, location, source, ownership or control of the proceeds by moving funds by wire and transfer of title to real and personal property. [SAC, ¶ 108].

*Monetary Transactions with Unlawful Proceeds*

Certain Defendants used proceeds derived from their unlawful activities to purchase exotic, antique and/or classic automobiles and numerous other assets with values in excess of $10,000. [SAC, ¶ 110]. Certain Defendants did so by using a financial institution engaged in interstate commerce. [SAC, ¶ 110].

*Extortion*

Certain Defendants committed extortion in connection with their schemes, when Defendants, through their counsel, Kenneth Reynolds, Esq., stated in February 2019 that they would obstruct, delay, and otherwise affect Plaintiff's commerce by tying Plaintiff up in litigation for five (5) years before declaring bankruptcy, unless Plaintiff relented in its pursuit of satisfying the debt. [SAC, ¶ 112].

*Interstate Racketeering*

Certain Defendants committed interstate racketeering from the period of 2012 through at least 2025, when those Defendants used the United States Postal Service and other facilities of interstate commerce with intent to distribute the proceeds of any unlawful activity or otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity. [SAC, ¶ 114].

*Interstate Transport of Misappropriated Funds*

Certain Defendants transported, transmitted, or transferred in interstate commerce funds valued at $5,000 or more knowing the same to have been misappropriated, converted, or taken by fraud from Soni Holdings to defraud Plaintiff. [SAC, ¶ 116]. Certain Defendants devised the fraudulent conveyance schemes and the Chase Bank Account scheme to defraud Plaintiff, and in connection therewith, transported or caused to be transported in interstate commerce funds having a value of $5,000 or more. [SAC, ¶ 117].

*Tampering with a Witness, Victim, or an Informant*

Certain Defendants engaged in witness tampering through their counsel Robert Bean, when he improperly advised and threatened Kanwal Kapur with legal action if he fully complied with a subpoena. [SAC, ¶ 122]. Certain Defendants also altered, destroyed, mutilated, or concealed

records, documents, or other objects, or attempted to do so, with the intent to impair the object's integrity or availability for use in an official proceeding or otherwise obstructed, influenced, or impeded any official proceeding, or attempted to do so. [SAC, ¶ 120].

*Pattern of Racketeering Activity*

Certain Defendants engaged in numerous acts of racketeering activity within ten years of each other. [SAC, ¶ 124]. The predicate acts described above were related in that they involved the same scheme, for the same or similar purposes, results, participants, victims and methods of commission, and did not involve isolated or sporadic events. [SAC, ¶ 124].

*Enterprise*

Defendants have engaged in a pattern of racketeering activity, participating in varying capacities in the wrongful and fraudulent schemes to allow defendants Om P. Soni, Anjali Soni, and Kunal Soni to divert assets from defendant Soni Holdings, in fraud of Plaintiff. [SAC, ¶¶ 125–26]. Defendants willfully associated themselves with and participated in the schemes, committing numerous fraudulent and wrongful acts which constitute the predicate acts described above. [SAC, ¶ 127]. Defendants knew about and agreed to facilitate the fraudulent schemes and provided knowing and substantial assistance toward accomplishment of the goals of the enterprise; therefore, all Defendants are liable as co-conspirators. [SAC, ¶¶ 128–29].

Defendants constitute an association-in-fact enterprise engaged in activities which affect interstate commerce within the meaning of 18 U.S.C. § 1962. [SAC, ¶ 131]. The individual defendants have conducted and participated directly in the conduct of the enterprise's affairs through a pattern of racketeering activity from May 14, 2007, through at least March 25, 2025. [SAC, ¶¶ 133–34]. Specifically, the individual Defendants engaged in a scheme to defraud Plaintiff in order to obtain financing and obstruct lawful satisfaction of the debt on numerous occasions

during the specified period and used the United States Postal Service and/or wires to communicate information to Plaintiff in furtherance of the schemes. [SAC, ¶ 134]. Defendants' acts injured Plaintiff's business or property, defrauded Plaintiff, and prohibited Plaintiff from satisfying the debt solely due to the fraudulent schemes by Defendants. [SAC, ¶ 135].

*Injury*

Plaintiff's injuries are present and this action is ripe. [SAC, ¶ 138]. Defendants are liable for the costs of the Guaranty enforcement action against defendant Om P. Soni and the fraudulent conveyance action in connection with the Oyster Bay Property against Om P. Soni and Anjali Soni, including reasonable attorney's fees for all actions against Defendants related to the enforcement of the debt owed to Plaintiff under the Note and subsequent Judgment. [SAC, ¶ 139]. Defendants are also liable for collection expense damages regarding all of the schemes involving enforcement of the debt to Plaintiff under the Note and Judgment.

Defendants' actions were willful, intentional, and malicious, or with such a high degree of recklessness that Defendants knew, must have known, or should have known, that harm would likely result to Plaintiff and its predecessor in interest. [SAC, ¶ 140]. Plaintiff seeks punitive damages against Defendants not less than three times Plaintiff's actual damages. [SAC, ¶ 140].

11. Fifth Cause of Action: Tortious Interference with Collectability of Debt

Defendants tortiously interfered with the collectability of the debt owed to Plaintiff by devising and implementing the aforementioned plan and schemes to render the Debtor insolvent and "judgment-proof," therefore preventing Plaintiff from collecting the justly owed debt. [SAC, ¶¶ 148–51].

12. Sixth Cause of Action: Lack of Legal Justification

Defendants' aforementioned plan to defraud Plaintiff, including wrongful conveyances of real property in New York, New Jersey and Florida, caused unjustifiable injury to Plaintiff. [SAC, ¶¶ 153–54].

**B. The Missouri Property**

The damages record also addressed Plaintiff's decision not to foreclose on the Debtor's real property located at 1175 East Karsch, Farmington, Missouri 63640 (the "Missouri Property"). Before the loan agreement was executed, the Missouri Property was assessed at approximately $300,000. [Nov. 7 Trial Tr. 196:1–3]. By the time the Note was delivered, the assessed value[9] fell to approximately $100,000. [Nov. 7 Trial Tr. 196:4–7]. Plaintiff investigated whether foreclosure on the Missouri Property would provide a meaningful source of recovery. [Nov. 7 Trial Tr. 133:5–10; 196:8–10; 198:4–5]. To that end, Plaintiff sent a realtor to inspect the Missouri Property, and the realtor reported it had been left open, abandoned, gutted, and was in substantial disrepair. [Nov. 7 Trial Tr. 133:5–10; 135:1–4]. At that time, the Missouri Property was assessed at approximately $50,000 and would have required significant additional time, expense, and investment before any recovery could realistically be pursued. [Nov. 7 Trial Tr. 136:20–25]. Based on that investigation, Plaintiff determined that foreclosure would not produce a meaningful net recovery and elected not to incur the additional expense of pursuing the Missouri Property. *Id*.

**C. The Default Liability Order**

The Default Liability Order granting liability in favor of Plaintiff against Defendants with respect to the Second Amended Complaint was entered August 9, 2025. The Court found that Defendants committed actual and intentional fraudulent conveyances of real property, mail fraud,

[9] Mr. Giordano testified that the Missouri Property was subject to an initial property appraisal in the early 2000s and assessed at approximately $300,000. [Nov. 7 Trial Tr. 196:1-2].

wire fraud, money laundering, mutilating/falsifying and backdating documents, false and fraudulent notarization of the "Family Agreement," racketeering, perjury, witness tampering, and numerous other unlawful acts to defraud the Plaintiff, as alleged in the First Cause of Action. The Court also entered judgment on the Fifth Cause of Action for tortious interference with the collectability of the debt; on the Sixth Cause of Action for the lack of legal justification causing unjustifiable injury to New Falls; and on the Seventh Cause of Action for attorney's fees pursuant to New York Debtor & Creditor Law § 276-A regarding the actual and intentional fraudulent conveyances and wrongful acts.[10]

## III. <u>LEGAL EFFECT OF DEFAULT ON DAMAGES</u>

The Court begins with the legal effect of the Default Liability Order, which deemed Defendants liable, but did not determine the amount of damages.

Bankruptcy Rule 7055 makes Rule 55 of the Federal Rules of Civil Procedure (the "<u>Civil Rules</u>") applicable in adversary proceedings. FED. R. BANKR. P. 7055. Under Civil Rule 55, a default is deemed to admit the well-pleaded factual allegations bearing on liability but not damages. The Second Circuit is clear that the trial court must determine damages unless the amount is liquidated or capable of mathematical calculation. *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158-59 (2d Cir. 1992) (default not considered an admission of damages); *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997) (damages must be based on appropriate evidence). Accordingly, although the Default Liability Order establishes Defendants' liability on the First, Fifth, Sixth, and Seventh causes of action and deems the factual allegations of the Second Amended Complaint admitted, Plaintiff still bears the burden of proving the amount of damages with competent evidence. The three claims

[10] Because Plaintiff does not have standing to prosecute the Seventh Cause of Action (the Trustee has such standing), it is not addressed in this Decision.

addressed in the decision are the civil RICO claim (First), the claim for tortious interference with the collectability of the debt (Fifth), and the claim for lack of legal justification causing unjustifiable injury to Plaintiff (Sixth).

The Soni Defendants' failure to appear at the Damages Trial did not alter the liability already entered against them, and their absence left Plaintiff's evidence unrebutted, but it does not permit the Court to enter the requested award as a matter of course. The Court must determine whether: (i) the damages sought were proved with reasonable certainty; (ii) the damages naturally flow from the injuries established by the Second Amended Complaint and the Default Liability Order; and (iii) each category of relief is authorized by governing law. *See Greyhound*, 973 F.2d at 159; *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999); *Transatlantic*, 109 F.3d at 111.

Plaintiff seeks more than a single liquidated recovery — it seeks: (i) the $265,834.84 Judgment debt; (ii) statutory interest from February 22, 2018; (iii) treble damages under civil RICO; (iv) attorney's fees and collection costs incurred in this adversary proceeding and related collection efforts; and (v) punitive damages. The Court therefore must identify the proper compensatory damages base, determine whether any portion of that base is subject to trebling under RICO, distinguish recoverable damages from statutory or contractual fee-shifting, assess whether punitive damages are legally available in addition to treble damages, and ensure that no category of relief duplicates another.

The same principles govern the effect of defendant Spears' and defendant Hugie's appearance at the Damages Trial. Their participation at the Damages Trial did not reopen liability or permit them to contest the facts and claims already established. It did, however, permit them to contest the amount and legal availability of the damages sought against them. *See Greyhound*, 973

F.2d at 158–59. The Court accordingly considered their rebuttal testimony, objections, cross-examination, and argument offered at the Damages Trial only insofar as those matters bear on the permissible amount, allocation, and legal basis of any damages awarded against them specifically.

Nor does default eliminate the need to determine the proper scope and amount of relief. Although the Default Liability Order established Defendants' joint and several liability for the damages arising from the claims on which the Judgment was entered, the damages awarded must nevertheless be tied to those claims, the admitted facts, and the evidence received at the Damages Trial. That distinction is especially important here, where the requested relief includes civil RICO trebling, attorney's fees under multiple theories, collection costs incurred in collateral proceedings, and punitive damages.

Finally, because the Default Liability Order was entered after default, the Court is constrained by Civil Rule 54(c), made applicable in this adversary proceeding by Bankruptcy Rule 7054. FED. R. CIV. P. 54(c); FED. R. BANKR. P. 7054(a). Civil Rule 54(c) provides that a default judgment "must not differ in kind from, or exceed in amount, what is demanded in the pleadings." FED. R. CIV. P. 54(c). The rule protects a defaulting defendant's right to rely on the relief demanded in the complaint in deciding whether to appear and defend. *See Silge v. Merz*, 510 F.3d 157, 160–61 (2d Cir. 2007). The Court therefore considers only those forms of relief demanded in the Second Amended Complaint and awards only those amounts that are supported by the established liability, damages record, and applicable law.

## IV. DISCUSSION

The issues presented are what damages were caused by the RICO enterprise for which Defendants have been held liable under the Default Liability Order, and which Defendants are responsible for what amount of those damages.

The Court must determine the amount of damages caused by the RICO violations, and the scope of the joint and several liability that flows from the Default Liability Order. The Default Liability Order "did not give the [Plaintiff] a blank check" to recover every loss it may have suffered; the [P]laintiff may recover only damages arising from the acts and injuries pleaded and must establish the extent of the injury in "dollars and cents." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 159 (2d Cir. 1992).

**A. Proximate Causation Is Required**

Civil RICO authorizes recovery of "threefold the damages" sustained by reason of the RICO violation, together with costs and reasonable attorney's fees. 18 U.S.C. § 1964(c). The Supreme Court has construed that phrase to require proximate causation. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992) (holding that civil RICO requires "some direct relation between the injury asserted and the injurious conduct alleged"); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457–61 (2006) (same); *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9–12 (2010) (plurality opinion) (reaffirming that civil RICO requires a relationship between the alleged fraud and the plaintiff's injury). Thus, the damages award must be tied to the injury caused by the RICO violation for which each Defendant has been held liable.

**B. Scope of Joint and Several Liability for Damages Caused by RICO Conduct**

The Court must also determine whether the admitted conduct constituted a single enterprise or multiple enterprises because that determination affects the scope of joint and several liability among Defendants. Courts in this District impose joint and several liability in civil RICO default judgments by reference to the enterprise or scheme in which each defendant participated. *Allstate Ins. Co. v. Nazarov*, No. 11-CV-6187 (PKC) (VMS), 2015 WL 5774459, at *17 (E.D.N.Y. Sept. 30, 2015); *Allstate Ins. Co. v. Yehudian*, No. 14-CV-4826 (JS) (AKT), 2018 WL 1767873, at *19 (E.D.N.Y. Feb. 15, 2018), *report and recommendation adopted*, 2018 WL 1686106 (E.D.N.Y. Mar.

31, 2018). That approach follows from civil RICO's causation requirement and the rule that a default does not admit damages. 18 U.S.C. § 1964(c); *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992); *Greyhound*, 973 F.2d at 158–59; *Credit Lyonnais Securities (USA), Inc. v. Alcantara*, 183 F.3d 151, 154–55 (2d Cir. 1999).

The relevant question to determine whether there is a *single* RICO enterprise is whether the acts were carried out by a continuing association with a common purpose and relationships among the participants. *Boyle v. United States*, 556 U.S. 938, 946 (2009); *United States v. Turkette*, 452 U.S. 576, 583 (1981); *First Cap. Asset Mgmt. Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173–75 (2d Cir. 2004). The existence of multiple transfers, acts, or schemes does not necessarily establish *multiple* RICO enterprises. *Boyle*, 556 U.S. at 946–48 (permitting informal association-in-fact enterprises with flexible structure); *Turkette*, 452 U.S. at 583 (requiring a continuing unit associated for a common purpose). The existence of multiple acts, transfers, or schemes also does not necessarily establish a *single* RICO enterprise. *First Cap. Asset Mgmt. Inc.,* 385 F.3d at 180–85 (rejecting an enterprise theory where the allegations did not establish the required common purpose and continuing unit); *D'Addario v. D'Addario*, 901 F.3d 80, 101–02 (2d Cir. 2018) (explaining that different defendants joining different fraudulent schemes at different times does not necessarily constitute one association-in-fact enterprise).

Here, the alleged common purpose was to render defendant Soni Holdings judgment-proof so that Plaintiff could not collect on the Judgment. If each of the four schemes detailed earlier were coordinated to advance that common collection-frustration objective, which it appears that they were, then those acts may be treated as components of one association-in-fact enterprise. *Boyle*, 556 U.S. at 946–48; *Turkette*, 452 U.S. at 583; *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 91–92 (2d Cir. 2015) (addressing alleged RICO enterprise involving different actors performing

different roles in an alleged scheme). If the same core actors coordinated the four overlapping schemes, this supports treating the conduct as one enterprise. *Boyle*, 556 U.S. at 946; *First Cap. Asset Mgmt.*, 385 F.3d at 174–75. If the acts used common entities, common assets, common documents, or a common collection-frustration strategy, that integration also supports treating the conduct as one enterprise. *Boyle*, 556 U.S. at 946; *Turkette*, 452 U.S. at 583.

But the Court may not combine distinct fraudulent episodes into one enterprise merely because they harmed the same plaintiff — there must be a shared fraudulent purpose and continuing unit. *First Cap. Asset Mgmt.*, 385 F.3d at 173–75, 180–85 (rejecting enterprise allegations that did not establish a shared fraudulent purpose and continuing unit); *D'Addario*, 901 F.3d at 101–02 (rejecting the premise that participation in different fraudulent schemes at different times necessarily establishes one enterprise). The Court may not infer one association-in-fact enterprise from a generalized intent to defraud, unless the record also establishes a common purpose, relationships, and sufficient longevity. *Boyle*, 556 U.S. at 946; *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120–21 (2d Cir. 2013) (affirming dismissal where the alleged enterprise members were not plausibly alleged to share the fraudulent purpose). The Court may not treat independent or uncoordinated predicate acts as proof of one enterprise merely because those acts fall within the same general category of misconduct. *D'Addario*, 901 F.3d at 101 (explaining that independent and uncoordinated predicate acts do not establish enterprise membership); *First Cap. Asset Mgmt.*, 385 F.3d at 174–75 (requiring coordinated association with a common purpose). The enterprise must be distinct from the pattern of racketeering activity, although the same evidence may sometimes prove both elements. *Turkette*, 452 U.S. at 583 (holding that enterprise and pattern are separate elements, while recognizing that proof used to establish them may overlap).

Last, finding a single enterprise does not require each participant to have performed the same act. *Boyle*, 556 U.S. at 948. It does not require each participant to have participated in every transaction. *Id*. It does not require formal organization, a formal hierarchy, or a formal agreement. *Id*. at 948; *Turkette*, 452 U.S. at 583. It does, however, require that the participants' acts be tied to a shared purpose and that the association function as a continuing unit long enough to pursue that purpose. *Boyle*, 556 U.S. at 946; *Turkette*, 452 U.S. at 583.

**C. Defendants' Schemes Constituted One Association-in-Fact Enterprise**

In sum, and as discussed above, courts consider certain indicators to determine whether schemes deemed admitted by default constitute a single enterprise or multiple, including: (1) whether the schemes were coordinated to advance a common objective; (2) whether the schemes involved the same core actors; and (3) whether the schemes involved common entities, assets, documents, or strategy. *Boyle*, 556 U.S. at 946; *Turkette*, 452 U.S. at 583. Taken together, these factors establish one association-in-fact enterprise, not multiple enterprises.

1. <u>Common Objective</u>

The first indication that the conduct was part of one association-in-fact enterprise is the existence of a common objective. An association-in-fact enterprise requires, at a minimum, "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. The Supreme Court described an association-in-fact enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct" and functioning as a continuing unit. *Turkette*, 452 U.S. at 583. The common purpose requirement is therefore central to determining whether several acts or schemes were components of one enterprise. *Boyle*, 556 U.S. at 946; *First Cap. Asset Mgmt., Inc.*, 385 F.3d at 173–75 (requiring allegations showing that the participants

shared a common purpose and functioned together as an enterprise); *D'Addario*, 901 F.3d at 101–02 (explaining that different defendants joining different schemes at different times do not necessarily share the common purpose required for one enterprise).

The Court also considers the limiting principle: a common victim alone does not establish a common objective. *First Cap. Asset Mgmt.*, 385 F.3d at 173–75, 180–85; *D'Addario*, 901 F.3d at 101–02. A common motive to avoid payment does not establish one enterprise unless the record also shows association, coordination, and a shared course of conduct. *Boyle*, 556 U.S. at 946; *Cruz*, 720 F.3d at 120–21; *First Cap. Asset Mgmt.*, 385 F.3d at 173–75. Nor does the fact that each act made collection more difficult automatically mean that each actor joined one enterprise. *D'Addario*, 901 F.3d at 101–02.

When multiple acts serve the same collection-frustration objective, the existence of more than one act or scheme does not require the Court to find multiple enterprises. *Boyle*, 556 U.S. at 946-48; *Turkette*, 452 U.S. at 583. At the same time, a single RICO enterprise cannot be established simply by pointing to disconnected fraudulent acts or a generalized fraudulent motive. *First Cap. Asset Mgmt.*, 385 F.3d at 173–75, 180–85; *Cruz*, 720 F.3d at 120–21 (affirming dismissal where the alleged enterprise members were not plausibly alleged to have shared the fraudulent purpose); *D'Addario*, 901 F.3d at 101–02 (rejecting premise that participation in different fraudulent schemes at different times necessarily establishes one enterprise).

Here, the Florida Property scheme, Chase Bank Account scheme, Oyster Bay Property scheme, and Newark Property scheme were all coordinated to advance the common objective of judgment-proofing the Soni Defendants. Thus, the common objective was to render defendant Soni Holdings and defendant Om P. Soni judgment-proof so that Plaintiff could not collect on the Judgment. That objective was not incidental to the alleged misconduct; it was the goal of the

alleged misconduct. The transfers, backdated documents, banking-related conduct, and related acts each operated to remove, conceal, encumber, or divert assets and value that otherwise could have been available to satisfy the Judgment.

The common objective alleged here is more concrete than a generalized desire to commit fraud. The alleged objective was not merely to injure Plaintiff in some abstract sense, but to prevent Plaintiff from collecting from defendant Soni Holdings or defendant Om P. Soni by placing their assets or value beyond Plaintiff's reach. The record shows that Defendants' acts were coordinated methods of achieving a concrete collection-frustration objective, which supports finding a singular enterprise. *Boyle*, 556 U.S. at 946; *Turkette*, 452 U.S. at 583; *Sykes*, 780 F.3d at 81–82, 91–92 (addressing alleged RICO enterprise in which different participants allegedly performed different roles in an integrated scheme).

The record supports treating the schemes as directed toward one common objective because the same collection-frustration purpose explains each material act. *Boyle*, 556 U.S. at 946; *First Cap. Asset Mgmt.*, 385 F.3d at 174–75. The Florida Property and Newark Property transfers served that purpose, because they moved assets and value away from defendant Soni Holdings and reduced assets available to satisfy the Judgment. The Oyster Bay Property scheme, which transferred the Oyster Bay Property from defendant Om P. Soni, was based on the common objective of frustrating Plaintiff's collection efforts. The Chase Bank Account scheme, which hid rental payments to Soni Holdings, was based on the common objective of frustrating Plaintiff's collection efforts. Accordingly, these acts may be understood as different mechanisms of one collection-frustration project, rather than as separate enterprises with unrelated ends. *Boyle*, 556 U.S. at 946–48; *Turkette*, 452 U.S. at 583; *Sykes*, 780 F.3d at 81–82, 91–92.

Last, guided by the limiting principle outlined above, the Court looks not merely to whether Plaintiff was harmed by each act, but whether the acts were directed toward the same concrete objective of preventing collection on the Judgment, including by placing assets of the borrower or guarantor beyond reach. *Boyle*, 556 U.S. at 946; *Turkette*, 452 U.S. at 583; *First Cap. Asset Mgmt.*, 385 F.3d at 173–75.

Here, the evidence does not show that the schemes were isolated, served materially different ends, or were not tied to the collection-frustration purpose; conversely, the evidence supports finding a common-objective between all four schemes. The evidence supports treating the conduct as one enterprise, because the transfers, backdated documents, banking conduct, and related acts were all directed toward preventing Plaintiff from collecting on the Judgment.

2. Same Core Actors

The second indication that the challenged conduct was part of one association-in-fact enterprise is the involvement of the same core actors across the alleged schemes. An association-in-fact enterprise must have "relationships among those associated with the enterprise." *Boyle*, 556 U.S. at 946. The Supreme Court in *Turkette* confirmed that an enterprise is a group associated together for a common purpose and functioning as a continuing unit. *Turkette*, 452 U.S. at 583. Overlap among the principal actors is relevant because it may show that the alleged schemes were not isolated episodes, but rather related acts carried out by a continuing association. *Boyle*, 556 U.S. at 946; *First Cap. Asset Mgmt.*, 385 F.3d at 173–75.

The Supreme Court expressly rejected any requirement that an association-in-fact enterprise have fixed roles, a formal hierarchy, a chain of command, regular meetings, or a formal structure, or that each participant must perform the same function. *Boyle*, 556 U.S. at 948; *see Sykes*, 780 F.3d at 81–82, 91–92. The relevant inquiry is whether the alleged schemes were

connected by a recurring core group whose conduct reflects relationships, coordination, and continuity. *Boyle*, 556 U.S. at 946; *Turkette*, 452 U.S. at 583; *First Cap. Asset Mgmt.*, 385 F.3d at 174–75.

The evidence confirms that Defendants were the same core actors across the relevant schemes involving the Newark Property, Florida Property, Oyster Bay Property, and Chase Account. Defendants Soni Holdings, Om P. Soni, Kunal Soni, and Anjali Soni directed or participated in the Florida Property scheme. Those same Soni Defendants also directed or participated in the Newark Property scheme, along with Defendants Hugie and Spears. Defendants Om P. Soni and Anjali Soni were likewise central participants in the Oyster Bay Property scheme. Defendants Soni Holdings and Richard Spears directed or participated in the Chase Bank Account scheme.

It must be noted that defendants Hugie and Spears are considered in this section only insofar as their involvement bears on whether the same core actors connected the schemes. Their participation in one or more of the four schemes at issue does not defeat a single-enterprise finding merely because they were not central actors in every scheme. *Boyle*, 556 U.S. at 948; *Sykes*, 780 F.3d at 81–82, 91–92. Nor does their participation, standing alone, make them the "core actors" for purposes of this factor. *Boyle*, 556 U.S. at 946; *First Cap. Asset Mgmt.*, 385 F.3d at 173–75. The actor-overlap question remains focused on whether the schemes were tied together by the same recurring central participants, which the record confirms as the Soni Defendants.

The four schemes at issue here are more naturally understood as related components of one alleged collection-frustration enterprise than as separate enterprises even though certain participants appeared in some, but not all, of the schemes. *Boyle*, 556 U.S. at 946–48; *Turkette*, 452 U.S. at 583; *Sykes*, 780 F.3d at 81–82, 91–92. The recurrence of the same central actors across

all four schemes reflects the relationships and continuity that the Supreme Court has identified as hallmarks of an association-in-fact enterprise, even though certain actors only participated in some of the schemes. *Boyle*, 556 U.S. at 946; *Turkette*, 452 U.S. at 583.

3. Common Entities, Assets, Documents, and Strategy

The third factor supporting a single-enterprise finding is that the alleged schemes were linked by common entities, assets, documents, and strategy. An association-in-fact enterprise must have "relationships among those associated with the enterprise" and sufficient longevity to permit those associates to pursue the enterprise's purpose. *Boyle*, 556 U.S. at 946. The enterprise must also function as a continuing unit. *Turkette*, 452 U.S. at 583. Shared instrumentalities, such as recurring entities, assets, accounts, agreements, or transfer documents, may be probative of those requirements because they can show that multiple schemes were not isolated transactions, but related means of advancing the same course of conduct. *Boyle*, 556 U.S. at 946; *First Cap. Asset Mgmt.*, 385 F.3d at 173–75.

The inquiry is practical, not formalistic, as RICO does not require one entity, one account, one asset, or one document to find a single enterprise. *Boyle*, 556 U.S. at 948. Nor does the use of different assets or instruments compel the conclusion that there were separate enterprises, so long as those assets and instruments were used as part of a common course of conduct. *Id*. at 946–48; *Turkette*, 452 U.S. at 583. At the same time, the Court may not treat separate transactions as one enterprise merely because they arose against the backdrop of the same debt or harmed the same creditor. *First Cap. Asset Mgmt.*, 385 F.3d at 173–75, 180–85; *D'Addario*, 901 F.3d at 101–02.

The relevant question is whether the entities, assets, documents, accounts, and methods used in the schemes involving the Newark Property, Florida Property, Oyster Bay Property, and Chase Account reveal a common collection-frustration strategy rather than a series of unrelated

transactions. *Boyle*, 556 U.S. at 946; *First Cap. Asset Mgmt.*, 385 F.3d at 173–75. The record reflects that the four schemes were not merely separate transactions involving different assets. They reflected a common strategy — placing assets and value exposed to Plaintiff's collection efforts beyond its reach. That strategy was implemented through related entities, conveyance of real property, account records, and financial channels. The Newark Property scheme involved real property and related documents used to affect ownership, control, or access to value connected to that property and its proceeds. The Florida Property scheme likewise involved the transfer or control of real property interests in a manner that placed value beyond Plaintiff's reach. The Oyster Bay Property scheme involved defendant Om P. Soni's personal asset, which bears on the same collection-frustration objective because he guaranteed the Debt and thereby exposed his personal assets to collection. The Chase Bank Account scheme involved the use of an account to receive, divert, or control funds that otherwise could have been available to Plaintiff. Although those schemes involved different assets and instruments, they employed the same basic strategy: moving, concealing, or diverting value in a way that impaired Plaintiff's ability to collect on the Debt and Judgment.

The documents used in the schemes are part of that same strategy. They matter not because "common documents" are an independent RICO requirement, but to demonstrate how the strategy was carried out. The RI Agreement" and notarization were used in connection with the Newark Property scheme. The Newark Property, Florida Property, and Oyster Bay Property transfer documents reflected transfers of property interests bearing on Plaintiff's collection rights. The Chase Account records reflected the receipt, diversion, or control of funds connected to the same collection-frustration effort. And the Guaranty, while not an instrument of the transfers, explains

why defendant Om P. Soni's personal assets were exposed to collection and why the transfer of the Oyster Bay Property fits within the same enterprise strategy.

Viewed together, those entities, assets, documents, and accounts reveal a coherent method of operation. The schemes used formal ownership records, transfer documents, notarizations, and account activity to make the movement or control of assets appear legitimate while impairing New Falls' ability to collect. That supports a single enterprise finding because it shows that the schemes were different applications of the same collection-frustration strategy, not unrelated transactions involving separate assets. *Boyle*, 556 U.S. at 946–48; *Turkette*, 452 U.S. at 583; *see also Sykes*, 780 F.3d at 81–82, 91–92.

This factor therefore favors treating the four schemes at issue as part of one association-in-fact enterprise.

**D. Scope of Joint and Several Liability for Damages Caused by the RICO Enterprise**

The Court must next determine the scope of the damages for which Defendants are jointly and severally liable. This inquiry focuses on the type of injury Plaintiff sustained by reason of the one association-in-fact RICO enterprise and, therefore, what damage falls within the scope of Defendants' joint and several responsibility.

Civil RICO permits recovery by a person injured in business or property "by reason of" a violation of 18 U.S.C. § 1962. 18 U.S.C. § 1964(c). That language requires proximate cause — there must be a direct relationship between the RICO violation and the injury for which damages are awarded. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992); *Anza*, 547 U.S. at 457–61; *Hemi Grp.*, 559 U.S. at 9–12. Even where liability has been established, damages still must be proven with reasonable certainty and must be tied to the injury caused by the RICO violation.

*Greyhound*, 973 F.2d at 158–59; *Credit Lyonnais*, 183 F.3d at 154–55; *Transatlantic*, 109 F.3d at 111 (2d Cir. 1997).

The relevant unit of injury is the damage caused by the sole enterprise — not separate injuries artificially divided by each defendant's individual role. Enterprise injury is not apportioned according to whether each defendant participated in every scheme, performed the same function, or occupied the same position within the enterprise. Rather, the inquiry is whether the plaintiff proved an injury directly caused by the enterprise's collection-frustration conduct. 18 U.S.C. § 1964(c); *Holmes*, 503 U.S. at 268; *Anza*, 547 U.S. at 457–61. Courts in this District have imposed joint and several liability by reference to the RICO enterprise or scheme for which the defendants were liable as a result of a default judgment. *Nazarov*, 2015 WL 5774459, at *17; *Yehudian*, 2018 WL 1767873, at *19.

Accordingly, damages are measured by the monetary injury Plaintiff proved it sustained because the enterprise placed recoverable assets or value beyond its reach. *See* 18 U.S.C. § 1964(c); *Holmes*, 503 U.S. at 268; *Greyhound*, 973 F.2d at 158–59. The Court therefore does not treat the face amount of every transfer, deed, account movement, or document associated with the schemes as a separate item of damages — Plaintiff may recover only once for the injury. *See Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490, 497 (2d Cir. 1995). Nor does the comparative culpability of any Defendant reduce the amount of a single, indivisible injury for which any one of them is jointly and severally liable. *See In re Masters Mates & Pilots Pension Plan & IRAP Litig.*, 957 F.2d 1020, 1027 (2d Cir. 1992).

The enterprise injury here is the impairment of Plaintiff's ability to collect on the Debt and Judgment, which, as set forth herein, has been established. The schemes operated together to transfer, divert, conceal, or control assets and value that were exposed to Plaintiff's collection

efforts. The Soni Defendants fall within the full scope of that enterprise injury. Defendants Soni Holdings, Om P. Soni, Anjali Soni, and Kunal Soni were the recurring central actors across the Newark Property scheme, the Florida Property scheme, the Oyster Bay Property scheme, and the Chase Bank Account scheme. Their conduct connected the schemes to the same objective. As the core actors in the enterprise, they are jointly and severally liable for the full amount of the enterprise injury established by the record. 18 U.S.C. § 1964(c); *Holmes*, 503 U.S. at 268; *Nazarov*, 2015 WL 5774459, at *17.

Defendant Spears likewise falls within the scope of the enterprise injury. Defendant Spears participated in the Newark Property scheme by directing defendant Hugie to falsely notarize the relevant document, and he participated in the Chase Bank Account scheme by signing and transacting with the Chase Account. Those acts connected him to two mechanisms of the same enterprise: (1) the use of documentation to support the Newark Property scheme; and (2) the use of an account to receive, divert, or control funds connected to the same collection-frustration strategy. Following the Default Liability Order, defendant Spears is jointly and severally liable for the damages proximately caused by the enterprise. *See Nazarov*, 2015 WL 5774459, at *17; *Yehudian*, 2018 WL 1767873, at *19.

Defendant Hugie's role was narrower as a factual matter, but that does not create a separate liability inquiry. The Newark Property scheme was part of the association-in-fact enterprise, and defendant Hugie's false notarization was part of that scheme. Accordingly, defendant Hugie is treated consistently with the other Defendants for purposes of the enterprise damages calculation. 18 U.S.C. § 1964(c); *Holmes*, 503 U.S. at 268; *Anza*, 547 U.S. at 457–61; *Greyhound*, 973 F.2d at 158–59.

Defendants are jointly and severally liable only for the injury caused by the enterprise's collection-frustration conduct. *Holmes*, 503 U.S. at 268; *Anza*, 547 U.S. at 457–61. Plaintiff must still prove the amount of that injury with reasonable certainty, and the Court must avoid duplicative recovery or damages not caused by the RICO violation. *Greyhound*, 973 F.2d at 158–59; *Credit Lyonnais*, 183 F.3d at 154–55. To the extent Plaintiff proved collection expenses proximately caused by the racketeering conduct, those expenses may be recoverable as RICO damages, distinct from the statutory attorney's fees and costs recoverable under 18 U.S.C. § 1964(c). *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1166–67 (2d Cir. 1993).

The scope of joint and several liability is therefore enterprise wide. Defendants are together jointly and severally liable for the damages proximately caused by the RICO enterprise, subject to Plaintiff's proof of the amount of that injury and trebling under 18 U.S.C. § 1964(c).

### E. Failure to Foreclose on the Missouri Property Does Not Reduce Recovery

The Court does not reduce Plaintiff's compensatory damages based on the failure to foreclose upon the Missouri Property. The record shows that Plaintiff considered foreclosure as a possible collection remedy, investigated the condition and value of the property, and reasonably determined that foreclosure would not produce a meaningful net recovery. The property declined substantially in assessed value, was left open, abandoned, gutted, and in disrepair, and required significant additional time and expense before any recovery could be realized.

Nor does the existence of that collateral defeat or reduce the damages otherwise established. Even assuming that mitigation principles apply to civil RICO damages, the party seeking a reduction must prove that the plaintiff unreasonably failed to pursue an available means of reducing its loss and that the proposed measure would have produced a net benefit. *See Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 820 & n.47 (2d Cir. 1983) (rejecting a mitigation

argument where the expense of the proposed remedial measure might have exceeded the resulting savings, and noting that failure to mitigate is an affirmative defense that must be pleaded and proved); *Bieter Co. v. Blomquist*, 987 F.2d 1319, 1329 (8th Cir. 1993) (explaining that tort law limitations on damages apply to civil RICO, and treating the failure to pursue a potential remedy as a mitigation issue). The damages record establishes neither proposition.

The damages record here does not support such a reduction. Plaintiff did not ignore an available source of recovery, investigated the Missouri Property and made a reasoned decision not to pursue a costly foreclosure on collateral that appeared to have little or no realizable net value. The Court will not apply any offset for the Missouri Property in calculating Plaintiff's compensatory damages.

## V. **CALCULATION OF DAMAGES**

Plaintiff established compensatory RICO damages measured by the collection injury caused by the enterprise. That injury consists of the unpaid amount of the Judgment, together with collection expenses proximately caused by the enterprise's obstruction of enforcement and collection. 18 U.S.C. § 1964(c); *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992); *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1165–67 (2d Cir. 1993).

The Judgment supplies the principal measure of Plaintiff's unpaid collection right: $265,834.84. Plaintiff has not recovered any portion of that Judgment. The unpaid balance — *i.e.,* unpaid collection right — is therefore $265,834.84, exclusive of any additional interest, statutory fees, costs, or other amounts addressed separately below.

The property and account evidence confirms that the enterprise impaired Plaintiff's ability to collect the Judgment: (a) the Florida Property sold for $220,000; (b) the Soni Defendants attempted to sell the Newark Property for $1,787,000 [*see* ECF No. 18-21, Ex. R] and it was

ultimately sold by the Trustee in 2026 for $1,850,000 [Bankr. Case ECF Nos. 239, 245]; (c) the Oyster Bay Property was worth several million dollars [Nov. 7 Trial Tr. 133:25]; and (d) the Chase Account moved hundreds of thousands of dollars beyond Plaintiff's reach. That evidence establishes that substantial recoverable value existed and was placed beyond Plaintiff's reach. The Court does not award the gross value of those assets as separate damages. Their significance is that they support the claimed collection injury. They do not supply an additional recovery independent of the unpaid Judgment.

In a civil RICO case, 18 U.S.C. § 1964(c) permits recovery only for injury to business or property sustained "by reason of" a RICO violation. 18 U.S.C. § 1964(c). As previously discussed, that phrase requires a direct relationship between the RICO violation and the injury for which damages are awarded. *Holmes*, 503 U.S. at 268 (1992); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457–61 (2006); *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9–12 (2010). The Court must therefore identify the monetary injury caused by the enterprise's collection-frustration conduct. The relevant injury is the impairment of Plaintiff's ability to collect on the Debt and Judgment. The enterprise operated by transferring, diverting, concealing, or controlling assets and value exposed to Plaintiff's collection efforts. The damages base must therefore be limited to the amount Plaintiff can prove it lost because that conduct placed recoverable value beyond its reach. 18 U.S.C. § 1964(c); *Holmes*, 503 U.S. at 268; *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158-59 (2d Cir. 1992).

**A. The Compensable RICO Injury**

The compensable injury is the injury Plaintiff sustained because the enterprise impaired its ability to collect on the Debt and Judgment. Civil RICO does not award damages for wrongful conduct in the abstract. Rather, it awards damages for injury to business or property caused "by

reason of" the RICO violation. 18 U.S.C. § 1964(c); *Holmes*, 503 U.S. at 268. The injury must therefore be concrete, monetary, and directly traceable to the enterprise's collection-frustration conduct. *Anza,* 547 U.S. at 457–61; *Hemi Grp.*, 559 U.S. at 9–12.

Expenses incurred because the enterprise obstructed collection may be recoverable if they were proximately caused by the RICO violation and proved with reasonable certainty. *Stochastic Decisions*, 995 F.2d at 1166–67. But expenses incurred in prosecuting the RICO action are addressed separately under the fee-shifting provision of 18 U.S.C. § 1964(c) unless they are independently proved as damages caused by the racketeering conduct. 18 U.S.C. § 1964(c); *Stochastic Decisions*, 995 F.2d at 1166–67.

Here, Defendants' enterprise injured Plaintiff by placing recoverable assets and value beyond its reach. The damages base must reflect Plaintiff's actual uncompensated loss, not a cumulative total of every transaction associated with the enterprise. The same principle applies to collection expenses.

The Court therefore treats the compensable RICO injury as the enterprise-caused collection loss, *i.e.*, the amount Plaintiff was unable to collect because Defendants' enterprise transferred, diverted, concealed, or controlled assets and value exposed to collection, together with any distinct collection expenses proximately caused by that conduct. The Court next determines the Debt and Judgment baseline against which that injury must be measured.

**B. The Debt and Judgment Baseline**

The damages analysis begins with the Debt that Plaintiff was prevented from collecting. Civil RICO compensates injury to business or property caused by the RICO violation. 18 U.S.C. § 1964(c); *Holmes*, 503 U.S. at 268. Where the injury is the frustration of collection, the relevant baseline is the amount the plaintiff was entitled to recover from the debtor and guarantor, less any

amounts already collected, credited, or otherwise satisfied. *Greyhound*, 973 F.2d at 158–59; *Credit Lyonnais*, 183 F.3d at 154–55.

Here, the Judgment defines the principal collection right impaired by the enterprise. The Court therefore measures the compensatory RICO injury against the unpaid Debt and Judgment, including any recoverable interest, costs, or other amounts that form part of Plaintiff's enforceable collection rights. Any payments, recoveries, credits, offsets, or collateral proceeds must be accounted for in determining the uncompensated loss. The object is to measure the injury Plaintiff sustained from the enterprise's interference with collection, not to award multiple recoveries for the same unpaid obligation. *Greyhound*, 973 F.2d at 158–59; *Stochastic Decisions*, 995 F.2d at 1165–67.

The schemes are relevant because they placed assets and value beyond Plaintiff's reach, thereby obstructing Plaintiff's ability to satisfy the Debt and Judgment. The Newark Property, Florida Property, Oyster Bay Property, and Chase Account are therefore relevant as evidence of recoverable value transferred, diverted, concealed, or controlled through the enterprise. *Holmes*, 503 U.S. at 268; *Greyhound*, 973 F.2d at 158–59.

### C. Scheme-Based Evidence

An unpaid debt may become a compensable RICO injury when collection is obstructed by the racketeering conduct. *Stochastic Decisions*, 995 F.2d at 1165; *see also Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1105–06 (2d Cir. 1988).

The Newark Property scheme affected value available to satisfy Plaintiff's claim. To the extent the Newark Property had equity, generated rents, or otherwise represented value that Plaintiff could have reached, that value informs the measure of the collection injury. The Florida Property scheme bears on damages in the same way. The transfer of control of the Florida Property

interest removed value from the assets available to satisfy the Debt and Judgment. The Oyster Bay Property scheme is relevant because defendant Om P. Soni guaranteed the Debt. The mansion was therefore within the universe of assets exposed to and then hidden from Plaintiff's collection efforts. Its transfer impaired Plaintiff's ability to reach defendant Om P. Soni's interest in the Oyster Bay Property, per the Guaranty.

The Chase Bank Account scheme concerns funds rather than real property, but the inquiry is the same. The relevant evidence is the amount of money received, diverted, controlled, or dissipated through the account that otherwise would have been available to Plaintiff. The account records may show the movement of rents, proceeds, or other value connected to the property schemes and the broader collection-frustration enterprise. They therefore bear on the extent to which enterprise-controlled funds remained unavailable to satisfy the Judgment.

Taken together, the scheme-based evidence establishes the recoverable value placed beyond Plaintiff's reach by the enterprise. The Court therefore considers the value associated with each as evidence of Plaintiff's actual collection loss, subject to the Debt and Judgment baseline, applicable credits and offsets, and the requirement that the damages awarded be caused by the RICO violation. 18 U.S.C. § 1964(c); *Holmes*, 503 U.S. at 268; *Stochastic Decisions*, 995 F.2d at 1165–67.

**D. Calculation of Compensatory RICO Damages**

As stated, Plaintiff has established a compensable RICO injury measured by the collection right Defendants impaired in the amount of $265,834.84, which Plaintiff has not recovered in whole or in part. The record discloses no offset, credit, or payment to Plaintiff with respect to the Judgment. The unpaid Judgment therefore supplies the principal measure of Plaintiff's injury, exclusive of interest, statutory fees, costs of suit, and any other relief addressed separately below.

*Vlock & Associates' Fees and Expenses*

Plaintiff seeks recovery of the Judgment but also seeks recovery of the fees and expenses incurred by Vlock & Associates as part of the trebled compensatory damages base. Generally, fees and expenses incurred in collection efforts may constitute compensatory RICO damages when they were reasonably incurred and proximately caused by the defendant's RICO violations. *See* 18 U.S.C. § 1964(c); *Stochastic Decisions*, 995 F.2d at 1166–6F7. Fees and costs incurred to prosecute this civil RICO action, by contrast, are recoverable, if reasonable, under the separate fee-shifting provision of 18 U.S.C. § 1964(c) and are not included in the trebled compensatory damages base.

Although both categories of legal fees and expenses ultimately furthered Plaintiff's effort to collect the Judgment, the distinction turns on the work performed. Plaintiff's existing submission does not separate the requested fees and expenses into those categories. The current record therefore does not permit the Court to determine the recoverable amounts without risking duplication.

Accordingly, the Court finds that Plaintiff is entitled to recover, as compensatory RICO damages, from all Defendants jointly and severally, those Vlock & Associates fees and expenses that were *reasonably incurred to collect the Judgment and were proximately caused by Defendants' obstruction of enforcement*. The Court will not, however, include in the compensatory damages base *those fees or costs incurred to prosecute the civil RICO claim itself*.

To assist the Court in distinguishing between those separate categories of Vlock & Associates' fees and expenses, Plaintiff is directed to submit a declaration, supported by its previously submitted billing records and trial exhibits, separating (a) collection-related fees and expenses from (b) civil RICO litigation fees and costs. Where an entry includes both categories, Plaintiff should make a reasonable allocation and explain its basis for the allocation. The

declaration should also confirm the amount of all applicable offsets, as discussed below (*see* Section IV(g)(3), *infra*).

Upon review of that submission, the Court will determine the amount of recoverable collection costs to be included in the compensatory RICO damages base (as opposed to the prosecution fees and costs). The Court will then address separately any statutory attorney's fees and costs recoverable under 18 U.S.C. § 1964(c), ensuring that no amount included in the trebled compensatory damages base is awarded again as a fee or cost of suit.

**E. Statutory Interest on the Underlying Judgment**

Plaintiff is also entitled to recover accrued post-judgment interest, but not pre-judgment interest on the RICO award. The Judgment was entered by a federal district court, so interest is governed by 28 U.S.C. § 1961. Section 1961 sets the applicable rate at the weekly average one-year constant-maturity Treasury yield for the calendar week preceding entry of judgment and requires interest to be computed daily and compounded annually. 28 U.S.C. § 1961(a)–(b). The applicable rate for the week ending February 16, 2018 (the week preceding February 22, 2018, when the Judgment was entered), was 1.97%. *See* BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, *Selected Interest Rates (H.15)* (week ending Feb. 16, 2018).

Plaintiff's Exhibit ("PX") 46 calculates the Judgment balance as $450,257.76 through November 7, 2025, the date of the commencement of the Damages Trial. But that calculation applies New York's nine-percent rate, so the Court declines to adopt it. The nine-percent rate prescribed by New York law does not apply merely because the federal Judgment was subsequently docketed in New York. *See Cappiello v. ICD Publ'ns, Inc.*, 720 F.3d 109, 112 (2d Cir. 2013) (holding that 28 U.S.C. § 1961 requires federal courts to apply the federal post-judgment interest rate to judgments entered in diversity actions when those judgments are later docketed in state

court). The federal rate of 1.97% must be applied to the $265,834.84 Judgment principal, computed daily and compounded annually, through at least November 7, 2025, to determine the principal-and-interest balance.

The Court therefore fixes November 7, 2025, as the cutoff date for post-judgment interest on the $265,834.84 Judgment principal. The amount of recoverable collection expenses remains to be determined separately. No later interest cutoff date will be used in calculating the compensatory RICO damages base.

As noted, and in sum, the only other component of Plaintiff's compensatory damages not yet fixed is the amount of recoverable collection expenses. After determining that amount, the Court will add the qualifying collection expenses to the principal-and-interest subtotal, and as set forth below, treble the resulting compensatory damages under 18 U.S.C. § 1964(c).

### F. Trebling of Compensatory RICO Damages

Civil RICO does not leave trebling to the Court's discretion. A plaintiff injured by a RICO violation "shall recover threefold the damages he sustains," together with the costs of suit and a reasonable attorney's fee. 18 U.S.C. § 1964(c). Once the compensatory damages caused by the RICO violation are determined, the statute requires that amount to be trebled.

The trebled RICO damages shall be awarded jointly and severally against all Defendants. That award will not duplicate any separate recovery of attorney's fees and costs under 18 U.S.C. § 1964(c). Fees and expenses included in the compensatory damages base will be included only if they were part of the collection injury caused by Defendants' racketeering conduct. Fees and costs incurred to prosecute the civil RICO action will be addressed separately under the fee-shifting provision of 18 U.S.C. § 1964(c) and shall not duplicate amounts included in the trebled damages award. *See Stochastic Decisions*, 995 F.2d at 1166–67.

### G. Statutory Attorney's Fees and Costs

Civil RICO provides that a prevailing plaintiff shall recover "the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c). As explained above, that recovery is distinct from the collection expenses included in the compensatory damages base. *Stochastic Decisions*, 995 F.2d at 1166–67.

Plaintiff's attorney's fees and costs span several statutes, and, as set forth below, the Court is careful to ensure that there is no duplication of fees and costs imposed on Defendants.

1. <u>Civil RICO Fees and Costs</u>

Because Plaintiff has prevailed on its civil RICO claim, 18 U.S.C. § 1964(c) entitles it to recover the cost of prosecuting that claim, including reasonable attorney's fees. 18 U.S.C. § 1964(c). That statutory award is separate from the compensatory damages base. It includes fees and costs incurred to obtain the RICO judgment, including work directed to the RICO pleadings, default proceedings, damages trial, post-trial submissions, and related proceedings necessary to establish and liquidate the RICO claim, but only to the extent those amounts have not already been included as collection expenses subject to trebling.

The governing measure of what constitutes reasonable attorney's fees is the familiar lodestar method — the hours reasonably expended multiplied by a reasonable hourly rate, informed by what a reasonable paying client would be willing to pay. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 184, 190 (2d Cir. 2008); *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011). The Court may exclude time that is excessive, redundant, inadequately documented, unrelated to the RICO claim, or already compensated as part of the compensatory damages award. *Hensley v. Eckerhart*, 461 U.S. 424, 433–34 (1983).

Plaintiff's trial exhibits reflect detailed billing records from Vlock & Associates, identifying the date of the work performed, the time expended, the amount charged, and the nature of the services rendered. Those records are sufficient to permit the required allocation between fees incurred as part of the collection injury and fees incurred as the cost of prosecuting this civil RICO action. The former may be included in the compensatory damages base; the latter are recoverable, if reasonable, under the fee-shifting provision of 18 U.S.C. § 1964(c). Unfortunately, Plaintiff's records do not distinguish between the two categories, leaving the Court unable to distinguish which damages may be trebled and which are subject to statutory fee-shifting.

In order for the Court to distinguish which of Vlock & Associates' asserted fees and costs are part of the compensatory damages base, and which are asserted under the fee-shifting provision, Plaintiff is directed to include in its supplemental declaration a separate calculation of the attorney's fees and costs incurred in prosecuting the civil RICO claim. The submission shall be confined to the billing records and trial exhibits already admitted, and Plaintiff should organize those materials only as directed herein. It shall: (1) identify the relevant billing entries, rates, hours, and costs; (2) exclude amounts sought as collection expenses within the trebled compensatory damages base; and (3) explain any reasonable allocation of an entry reflecting both categories of work. The submission may not include new evidence, billing entries, legal theories, or categories of recovery. Upon review, the Court will determine the reasonable fees and costs recoverable under 18 U.S.C. § 1964(c), ensuring that no amount is awarded twice.

2. <u>Non-Duplication</u>

Although the same litigation may support more than one basis for recovery, Plaintiff may recover each dollar only once. Fees and expenses incurred because Defendants obstructed collection are recoverable as compensatory RICO damages to the extent they were proximately

caused by the racketeering conduct. *Stochastic Decisions*, 995 F.2d at 1166–67. Fees and costs incurred to prosecute this civil RICO action are recoverable, if reasonable, under 18 U.S.C. § 1964(c). Those categories may overlap in the billing records, but they may not overlap in the award.

Plaintiff's supplemental declaration shall therefore assign each fee or cost entry to its proper function. If a billing entry reflects more than one recoverable category, Plaintiff shall allocate the entry by reasonable approximation, explain the basis for the allocation, and ensure that no portion of the same entry is counted twice.

After reviewing that submission, the Court will determine the amount of statutory attorney's fees and costs recoverable under § 1964(c). That award shall be in addition to the trebled RICO damages but shall not duplicate any amount included in the compensatory damages base or awarded under another fee-shifting provision.

### 3. Applicable Offsets

Additionally, the total amount of fees and expenses incurred by Vlock & Associates should be offset to the extent such fees and expenses were previously paid by the Soni Defendants.

At the Damages Trial, Mr. Giordano acknowledged on the record that the Soni Defendants previously paid a small portion of the attorney's fees incurred by Vlock & Associates in the amount of $12,423.96, stating as follows:

> Notably, we have taken a look at our records and saw that the Soni defendants did actually pay attorney's fees of the sum of $12,423.96 after they were held in contempt twice by the District Court three years ago. Accordingly, we hereby consent to the Court reducing the amount of collection costs by that amount.

[Nov. 17 Trial Tr. 52:8−13]. Since these fees were incurred in connection with the prosecution of the RICO action[11], this offset shall only bear on that category of attorneys' fees, and shall not affect the compensatory category of fees and expenses incurred prior to the RICO action to collect the Judgment.

### H. Punitive Damages

The Court determines that punitive damages may be warranted against defendant Kunal Soni but reserves determination of the amount. The Court will fix any amount only after Plaintiff submits the supplemental declaration required by this Decision and the Court determines the final compensatory RICO damages base and resulting mandatory treble award, as those amounts bear on the punitive award.

As explained above, 18 U.S.C. § 1964(c) supplies mandatory trebling, not an additional punitive remedy. The Court considers punitive damages under New York law on the Second Amended Complaint's Fifth Cause of Action for tortious interference with the collectability of the Debt, which was adjudicated by the Default Liability Order. [SAC ¶¶ 148–51; ECF No. 84]. The District Court treated that claim as arising under New York law. *See New Falls Corp. v. Soni Holdings, LLC*, No. 2:19-cv-00449 (ADS) (AKT), 2020 WL 13850728, at *7 (E.D.N.Y. Mar. 31, 2020). Because punitive damages are parasitic and have no viability apart from a substantive cause of action, the Fifth Cause of Action supplies the state law basis for the requested remedy. *See Rocanova v. Equitable Life Assurance Society of the United States*, 83 N.Y.2d 603, 616 (1994). The Court therefore need not decide whether the Sixth Cause of Action could independently support the same remedy.

[11] The portion of attorneys' fees paid by the Soni Defendants relates to the contempt orders entered by the District Court in the RICO action, dated March 8, 2021 (PX 20) and September 20, 2022 (PX 21).

The absence of a separate compensatory award on the Fifth Cause of Action does not foreclose punitive relief. As discussed in Section V, *infra*, that tort caused the same actual collection injury included in the compensatory RICO damages base; therefore, a second award is withheld to prevent double recovery. *See Bender v. City of New York*, 78 F.3d 787, 793–94 (2d Cir. 1996). The predicate of actual or nominal damages is therefore satisfied. *See Action House, Inc. v. Koolik*, 54 F.3d 1009, 1013–15 (2d Cir. 1995).

Punitive damages under New York law require more than intentional wrongdoing. The conduct must evince "a high degree of moral turpitude" and "such wanton dishonesty as to imply a criminal indifference to civil obligations." *Ross v. Louise Wise Services, Inc.*, 8 N.Y.3d 478, 489 (2007) (quoting *Walker v. Sheldon*, 10 N.Y.2d 401, 405 (1961)); *see also Rocanova*, 83 N.Y.2d at 613. Ordinary fraud or intentional tortious conduct, without more, does not satisfy that exceptional standard. *See Marinaccio v. Town of Clarence*, 20 N.Y.3d 506, 511–12 (2013).

RICO trebling does not categorically bar punitive damages on an independent state-law tort. *See Bingham v. Zolt*, 66 F.3d 553, 564–65 (2d Cir. 1995) (affirming a reduced punitive award on common-law claims despite treble damages on RICO claims and noting that the common-law theories rested on the same facts, acts, and injuries); *Harvey v. Home Savers Consulting Corp.*, No. 07-CV-2645 (JG) (SMG), 2011 WL 13298705, at *11 (E.D.N.Y. Mar. 3, 2011) (awarding punitive damages on non-RICO claims while reducing the amount to account for RICO trebling). Because trebling has a punitive and deterrent component, however, the Court must consider the cumulative sanction and avoid an excessive aggregate award. *See Bingham*, 66 F.3d at 564–65; *Harvey*, 2011 WL 13298705, at *11.

New York law permits post-injury misconduct to inform punitive relief when it is directly connected to an effort to conceal the underlying tort or evade accountability for it. *See Gomez v.*

*Cabatic*, 159 A.D.3d 62, 76–78 (2d Dep't 2018) (permitting punitive damages for post-injury destruction of records undertaken to evade liability for the underlying tort). That connection is established as to defendant Kunal Soni. His false sworn testimony concerning defendant Soni Holdings' ownership and income was alleged as part of the Newark Property scheme and therefore overlaps with the factual course of conduct supporting the RICO claim. [SAC ¶¶ 39–40, 45, 47–48, 50]. The Court does not treat that testimony as conduct distinct from RICO or rely on it as a basis for punitive relief.

The contempt history, however, supplies later, defendant-specific aggravating evidence that was not one of the racketeering predicates supporting trebling. After the District Court enjoined further encumbrances on the Newark Property and first held the Soni Defendants in contempt, defendant Kunal Soni, as manager of defendant 632 MLK Blvd Jr LLC, was specifically found in contempt for willfully allowing additional unpaid taxes and liens to accrue. *See New Falls Corp. v. Soni Holdings, LLC*, No. 19-CV-00449 (SJF) (AKT), 2021 WL 919110, at *9–10 (E.D.N.Y. Mar. 8, 2021) (finding a lack of good faith or reasonable diligence); *New Falls Corp. v. Soni Holdings, LLC*, No. 19-CV-00449 (HG) (LGD), 2022 WL 4357410, at *4–6 (E.D.N.Y. Sept. 20, 2022) (finding renewed noncompliance willful and applying the contempt finding to Kunal Soni based on his role as manager of 632 MLK Blvd Jr LLC).

The Court considers Kunal Soni's willful, repeated post-order noncompliance only as evidence of the moral culpability accompanying his continuing interference with collectability. That noncompliance directly impaired the same Newark Property collateral the orders were designed to preserve. Any punitive remedy will rest on the Fifth Cause of Action, and any amount will account for the mandatory RICO trebling and contempt-related awards to avoid an excessive aggregate sanction.

The record does not support the same finding as to any of the other Defendants. The Court does not rely on the letters[12] filed on the bankruptcy docket because the record does not conclusively establish that defendant Om P. Soni authored or mailed them, and alleged threats, witness tampering, or intimidation not attributed to a particular Defendant cannot support an award against that Defendant. Defendant Om P. Soni's false denial of the Guaranty and participation in the collection-obstruction schemes support the liability and RICO findings, but do not supply distinct aggravating conduct for an additional punitive award. The second contempt ruling declined to hold defendant Om P. Soni in contempt, and the earlier collective finding does not provide sufficient individual attribution. *See New Falls*, 2022 WL 4357410, at *5–6. Punitive damages are therefore denied as to as to all Defendants other than Kunal Soni.

When fixing the amount of any punitive damages to be awarded against defendant Kunal Soni, the Court will consider the reprehensibility of his conduct, the relationship between the award and the actual or potential harm, and the civil penalties authorized or imposed for comparable misconduct. *See BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574–85 (1996). New York law likewise requires a reasonable relationship to the harm and the flagrancy of the conduct. *See Nardelli v. Stamberg*, 44 N.Y.2d 500, 503–04 (1978); *Liberman v. Riverside Memorial Chapel*, 225 A.D.2d 283, 292 (1st Dep't 1996). Few awards exceeding a single-digit ratio between punitive and compensatory damages will satisfy due process, and a lower ratio may be required where compensatory damages are substantial. *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 424–26 (2003). The Court will also consider any competent evidence already in the record concerning defendant Kunal Soni's financial circumstances, the mandatory

[12] The Court received several letters that were recorded on the docket. The letters assert amounts of $1,000,000,036,070 [Bankr. Case ECF No. 162], $25,000,000,000 [Bankr. Case ECF No. 175], and $100,000,000,000 [Bankr. Case ECF No. 184].

RICO trebling and contempt-related awards as part of the aggregate sanction, and Civil Rule 54(c)'s limitation on default relief. *See Brink's Inc. v. City of New York*, 717 F.2d 700, 706–07 (2d Cir. 1983); *Silge v. Merz*, 510 F.3d 157, 160–61 (2d Cir. 2007); FED. R. CIV. P. 54(c); FED. R. BANKR. P. 7054(a).

## VI. THE REMAINING CAUSES OF ACTION

The Memorandum Decision resolved the fraudulent transfer causes of action. The Default Liability Order thereafter entered liability on the remaining causes of action. Here, having resolved damages with respect to the First Cause of Action (civil RICO), the remaining viable causes of action are as follows:

> **Fifth Cause of Action — Tortious Interference with Collectability of Debt**. This claim provides an alternative state law basis for liability arising from the same collection injury and, as discussed above, the state law basis for considering punitive damages. It does not support an additional compensatory recovery for that same injury; and
>
> **Sixth Cause of Action — Lack of Legal Justification Causing Unjustifiable Injury**. This claim likewise provides an alternative basis for liability but does not support a separate compensatory award for the same collection injury.

The Court addresses below whether the Fifth and Sixth Causes of Action provide relief beyond that already awarded under the First Cause of Action.

### A. The Remaining Claims Do Not Increase the Compensatory Award

Plaintiff's remaining causes of action do not support a monetary recovery in addition to the RICO award, except to the extent Plaintiff proves a distinct injury or obtains non-duplicative equitable or statutory relief. A plaintiff may prevail on multiple legal theories, but it may not recover twice for the same injury. *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 497 (2d Cir. 1995) (recognizing that damages awarded under different theories may not duplicate the same loss); *Gentile v. County of Suffolk*, 926 F.2d 142, 153–54 (2d Cir. 1991) (explaining that a plaintiff

may not receive double recovery for one injury); *see also Medinol Ltd. v. Boston Sci. Corp.*, 346 F.Supp. 2d 575, 607 (S.D.N.Y. 2004) (declining duplicative recovery where different claims compensated the same injury).

Here, the RICO award compensates Plaintiff for the injury sustained when the enterprise impaired its ability to collect on the Debt and Judgment. The remaining claims arise from the same collection-frustration conduct and seek relief for the same practical injury: Plaintiff's inability to collect amounts owed on the Debt and Judgment. Those claims may supply alternative theories of liability or grounds for particular remedies, but they do not permit a second monetary recovery for the same unpaid Judgment, accrued interest, or collection expenses already included in the RICO award. *Indu Craft*, 47 F.3d at 497; *Gentile*, 926 F.2d at 153–54. Accordingly, the Court does not award separate compensatory damages on the remaining causes of action for the same collection injury remedied through RICO. *Id*. The Court considers those claims only to the extent they support non-duplicative equitable relief, statutory fees, punitive damages, or other relief not already captured in the RICO award. *Medinol*, 346 F.Supp.2d at 607.

**B. The Remaining State Law Claims Do Not Increase the Compensatory Award**

The Fifth Cause of Action provides an alternative state law basis for liability arising from Defendants' interference with the collectability of the Debt and Judgment and supplies the state law basis for considering punitive relief. It does not support an additional compensatory award for the collection injury already remedied under RICO.

The Sixth Cause of Action likewise establishes an alternative basis for liability arising from the same conduct and injury but does not support a separate compensatory recovery.

## VII. POST-JUDGMENT INTEREST

Plaintiff is entitled to post-judgment interest on the money judgment that will be entered in this adversary proceeding as a result of this Decision. Section 1961 provides that interest "shall

be allowed on any money judgment in a civil case recovered in a district court," calculated from the date of entry of judgment at the federal rate prescribed by the statute. 28 U.S.C. § 1961(a); *Cappiello v. ICD Publ'ns, Inc.*, 720 F.3d 109, 112 (2d Cir. 2013). Section 1961 further provides that post-judgment interest is computed daily and compounded annually. 28 U.S.C. § 1961(b).

Post-judgment interest is distinct from the statutory interest that accrued on the Judgment. The latter forms part of the unpaid collection right included in the compensatory RICO damages base. Post-judgment interest under 28 U.S.C. § 1961 accrues on the judgment entered in this adversary proceeding from the date of its entry until paid. 28 U.S.C. § 1961(a)–(b); *Cappiello*, 720 F.3d at 112.

Accordingly, post-judgment interest shall accrue on the total money judgment entered in this adversary proceeding from the date the judgment is entered on the docket until paid, at the rate prescribed by 28 U.S.C. § 1961(a), computed daily and compounded annually as required by 28 U.S.C. § 1961(b).

## VIII. CONCLUSION

For the reasons set forth above, the Court concludes that the Newark Property scheme, the Florida Property scheme, the Oyster Bay Property scheme, and the Chase Bank Account scheme formed one association-in-fact enterprise. All Defendants are jointly and severally liable for the damages proximately caused by the enterprise's obstruction of Plaintiff's collection efforts.

Plaintiff established that the Judgment remains unpaid. The compensatory RICO damages base therefore includes the unpaid Judgment principal, accrued statutory judgment interest, and those collection expenses that Plaintiff establishes were reasonably incurred and proximately

caused by Defendants' obstruction of enforcement. Plaintiff has recovered no portion of the Judgment, and the record discloses no offset or credit reducing the collection injury.

Plaintiff also established that it incurred substantial fees and expenses in attempting to collect the Judgment, pursue assets, challenge transfers, trace funds, enforce orders, and respond to Defendants' obstruction of collection. Those expenses are recoverable as compensatory RICO damages to the extent they were proximately caused by the enterprise's racketeering conduct. Fees and costs incurred to prosecute this civil RICO action are not part of the compensatory damages base and are recoverable, if reasonable, under the separate fee-shifting provision of 18 U.S.C. § 1964(c). The compensatory RICO damages, once the amount of that base is fixed, shall be trebled and awarded jointly and severally against all Defendants. Any statutory fees and costs awarded under 18 U.S.C. § 1964(c) shall be awarded separately and shall not duplicate amounts included in the trebled compensatory damages award.

The Court further concludes that punitive damages may be warranted against defendant Kunal Soni, but not against the remaining Defendants, for the defendant-specific reasons stated above. Any amount assessed separately against defendant Kunal Soni will be fixed after the compensatory RICO damages base and resulting mandatory treble award are determined, under the standards stated above and without an additional evidentiary submission concerning punitive damages.

The remaining causes of action do not support an additional compensatory damages award for the same collection injury remedied by the RICO judgment.

Within fourteen (14) days after entry of this Decision, Plaintiff shall submit a supplemental declaration limited to organizing and calculating amounts reflected in the trial exhibits and billing records already admitted. The declaration shall identify: (i) interest on the underlying Judgment,

calculated under 28 U.S.C. § 1961 at 1.97% through the date of the declaration; (ii) the collection fees, costs, and expenses sought as compensatory RICO damages; and (iii) the attorney's fees and costs sought under 18 U.S.C. § 1964(c) for prosecuting this civil RICO action, subject to all applicable offsets. The declaration shall explain any reasonable allocation of a mixed billing entry and shall ensure that no amount is counted twice. This submission is limited to the ministerial organization of evidence already admitted and, therefore, Defendants shall not file a response. Similarly, Plaintiff shall not submit new evidence, billing entries, legal theories, categories of relief, or substantive argument. If the submission contains new matter, the Court will disregard that material. Post-judgment interest shall accrue on the total money judgment entered in this adversary proceeding from the date of entry until paid, at the rate prescribed by 28 U.S.C. § 1961(a), computed daily and compounded annually as required by § 1961(b). FED. R. BANKR. P. 7058, 9021; E.D.N.Y. LBR 9021-1(a).

After reviewing Plaintiff's supplemental submission, the Court will as soon as reasonably practicable thereafter: (i) fix the compensatory RICO damages base; (ii) treble that amount under 18 U.S.C. § 1964(c); (iii) determine any non-duplicative statutory attorney's fees and costs; (iv) fix any punitive damages assessed against defendant Kunal Soni on the existing record under the standards stated above; and (v) enter judgment consistent with this Decision.

**IT IS SO ORDERED.**

**Dated: Central Islip, New York**
**September 16, 2026**

Sheryl P. Giugliano
United States Bankruptcy Judge